UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ISILON SYSTEMS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>TWIN CITY FIRE INSURANCE COMPANY, an Indiana corporation,<br><br>Defendant. | CASE NO.: C10-1392 MJP<br><br>ORDER ON PARTIAL SUMMARY JUDGMENT |

This matter comes before the Court on Defendant Twin City Fire Ins. Co.'s motion for partial summary judgment. (Dkt. No. 107.) Having reviewed the motion, Plaintiff Isilon Sys. Inc.'s response (Dkt. Nos. 131, 138), the reply (Dkt. Nos. 147, 149), and all related papers (Dkt. Nos. 108, 131, 133, 134, 135, 136, 137, 139, 140, 141, 148, 150) the Court GRANTS the motion in part and DENIES in part.

**Background**

In 2006, Defendant Twin City Fire Ins. Co. ("Twin City") sold Plaintiff Isilon Sys. Inc. ("Isilon") an insurance policy covering Isilon and its executives for "loss" including litigation

ORDER ON PARTIAL SUMMARY JUDGMENT- 1

defense fees and costs. (Dkt. No. 1 at ¶ 16.) Plaintiff was insured against similar loss by a tower of liability insurance composed of multiple insurers. (Dkt. No. 74 at 1.) Defendant insured Plaintiff for $5 million in excess coverage of the $20 million in coverage the other insurers provided to Plaintiff. (Id. at ¶¶ 8-16.)

On September 14, 2009, the SEC filed a case with this Court alleging Stuart Fuhlendorf ("Fuhlendorf") engaged in financial reporting fraud while he worked as Chief Financial Officer at Isilon. Sec. and Exch. Comm'n v. Stuart W. Fuhlendorf ("Underlying Action") Case No. C09-01292MJP (W.D. Wash. Nov. 23, 2011); (Dkt. No. 1 at ¶ 25). That case was resolved on November 23, 2011, when this Court entered a final judgment in the Underlying Action enjoining Fuhlendorf from violating the Securities Exchange Act of 1934 and the Securities Act of 1933, and from acting as an executive at a securities related organization for three years. (Underlying Action, Dkt. No. 363.)

During the litigation of the Underlying Action, Fuhlendorf incurred litigation fees over the underlying insurance tower limits, estimated at $5 million. (Dkt. No. 1 at ¶¶ 22, 26; Dkt. No. 67, Ex. 3 at 5.) Prior to July 2010, Plaintiff indemnified Fuhlendorf for $5 million in defense fees and costs. (Dkt. No. 1 at ¶¶ 21, 26; Dkt. No. 67, Ex. 3 at 5.) Plaintiff, in turn, sought reimbursement from its insurers or asked its insurers to pay Fuhlendorf's costs directly. (Dkt. No. 1 at ¶ 21.)

In July, 2010, Plaintiff asked Defendant to begin paying Fuhlendorf's defense fees because the policy underlying Defendant's policy was nearly exhausted. (Id. at ¶ 25.) On July 26, 2010, Defendant sent a letter to Plaintiff in which it denied coverage to Fuhlendorf under the policy because Defendant believed that, at the time Isilon applied for insurance, Fuhlendorf had knowledge or information that could have led to a claim under the policy. (Dkt. No. 65 at 9; Dkt.

ORDER ON PARTIAL SUMMARY JUDGMENT-
2

No. 49 at 18-19.) In making its coverage determination, Defendant reviewed information provided by Isilon's defense counsel, including 180,520 documents that Plaintiff delivered to the SEC as part of its investigation in the Underlying Action. (Dkt. No. 101 at 3.) Defendant alleged such information violated the policy's prior knowledge warranty in which Plaintiff assured that "No Insured under the Excess Limits has knowledge or information of any act, error, or omission which might give rise to a claim(s), suit(s) or action(s) under the Excess Limits." (Dkt. No 49 at 17.)

On August 27, 2010, Plaintiff brought this case based on Defendant's denial of coverage. (Dkt. No. 1 at ¶ 25). On January 7, 2011, Defendant sent Plaintiff a letter stating it was withdrawing its denial of coverage and planned on paying its limits once it received proof of payment of the underlying insurance limits, subject to a reservation of rights. (Dkt. No. 108, Ex. 24 at 5.) On April 27, 2011, Plaintiff received its final payment of the limits on the last underlying insurance policy which was issued by Hudson Specialty Insurance Company ("Hudson"). (Dkt. No. 65 at 9-10.) Defendant advanced Plaintiff $5 million in June and July, 2011, within the contracted 90 day window for payment upon notification of exhaustion. (Dkt. No. 65 at 10; Dkt. No. 49 at 19.) Defendant now moves for partial summary judgment on Plaintiff's claims for violation of Washington's Consumer Protection Act ("CPA"), RCW 19.86, breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Washington's Insurance Fair Conduct Act ("IFCA"), RCW 48.30. (Dkt. No. 1 at ¶¶ 30-32, 34-39, 42-45, 46-50.)

**Analysis**

A. <u>Standard</u>

Federal Rule 56(a) states a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

ORDER ON PARTIAL SUMMARY JUDGMENT-
3

1  matter of law." Fed. R. Civ. P. 56(a). A court views the underlying facts in the light most
2  favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
3  475 U.S. 574, 587 (1986). The moving party has the burden to show the absence of a genuine
4  issue of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). Once the moving
5  party has met its initial burden, the nonmoving party must "designate specific facts showing that
6  there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). In
7  diversity actions, a court applies the substantive law of the state in which it sits. 28 U.S.C. §
8  1652; Erie R. R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

9  B.  CPA

10     Plaintiff's Consumer Protection Act claim, RCW 19.86, fails because Plaintiff cannot
11 show an injury to its business or property. There are five elements of a CPA claim a plaintiff
12 must satisfy to obtain relief: (1) an unfair or deceptive act or practice, (2) in trade or commerce,
13 (3) impacting the public interest, (4) and which causes an injury to the party in his business or
14 property that (5) is causally linked to the unfair or deceptive act. Hangman Ridge Training
15 Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780 (1986).

16     Here, Plaintiff cannot establish an injury to its business or property caused by
17 Defendant's denial of coverage because Defendant performed under the contract. (Dkt. 138 at
18 24.) Plaintiff seeks as damages: (1) $5 million Plaintiff paid towards Fuhlendorf's defense, (2)
19 $172,814.61 in interest on the $5 million for the period of time between the date Twin City's
20 reimbursement obligation accrued as to each invoice and the date Twin City fully paid the $5
21 million, (3) $2 million stemming from a separate class action settlement, (4) treble damages, and
22 (5) attorneys' fees and costs. (Dkt. No. 106 at 5-6; Dkt. No. 67, Ex. 3 at 6.)

23     Plaintiff cannot establish it is entitled to $5 million and prejudgment interest because
24 Defendant properly paid $5 million to Plaintiff in June and July, 2011, within the contracted 90

ORDER ON PARTIAL SUMMARY JUDGMENT-
4

1  day window for payment upon notification of exhaustion. (Dkt. Nos. 108-19, -20 at 1-2.)
2  Because Defendant did not wrongfully retain money from Plaintiff, Plaintiff cannot establish a
3  claim to prejudgment interest. Colonial Imports v. Carlton Nw., Inc., 83 Wn. App. 229, 241
4  (1996) (Washington law bases prejudgment interest awards on the principle that a defendant who
5  retains money which he or she ought to pay to another should, as a matter of public policy, pay
6  interest on it, not as a penalty for wrongdoing, but simply as additional damages for the use value
7  of money owed for a liquidated claim). Plaintiff is not entitled to the $2 million stemming from a
8  separate class action because the Court ruled on February 15, 2012 that Plaintiff is precluded
9  from claiming the $2 million because it failed to properly plead that claim in its complaint and
10 amended complaint. (See Dkt. No. 143 at 4.) Plaintiff cannot establish damages based on its
11 demand for attorneys' fees because the cost of prosecuting a CPA claim is not a cognizable
12 harm. See Panag v. Farmers Ins. Co. of WA., 166 Wn.2d 27, 60 (2009). Because Plaintiff has not
13 conclusively shown it was damaged by Defendant's actions, the Court grants summary judgment
14 for Defendant on Plaintiff's CPA claim.

15 C.  Breach of Contract

16      Plaintiff's breach of contract claim fails because Defendant performed under the contract.
17 (Dkt. No. 108-12 at 1; Dkt. Nos. 19, 20.) The underlying insurer, Hudson, made its final payment
18 to Plaintiff on April 27, 2011. (Dkt. No. 108-12 at 1; Dkt. Nos. 19, 20.) Defendant paid $5
19 million to Plaintiff in June and July, 2011. (Dkt. No. 108-12 at 1; Dkt. Nos. 19, 20.) Under the
20 terms of the contract, liability for any loss attaches to Defendant only after the underlying excess
21 insurers "have paid the full amount of their respective liability." (Dkt. No. 108-1 at 4.) Therefore,
22 Defendant was not required to pay Plaintiff until Hudson exhausted its liability limits by actual
23 payment of claims.
24

ORDER ON PARTIAL SUMMARY JUDGMENT- 5

1  Plaintiff's argument that Defendant anticipatorily breached the contract fails as a matter
2  of law. Anticipatory repudiation occurs when a defendant distinctly and unequivocally asserts its
3  intention not to perform its obligations under a contract before the time for performance. <u>Wallace
4  v. Kuehner</u>, 111 Wn. App. 809, 816 (2002). In this case, Defendant's denial of coverage did not
5  amount to a repudiation, because it was not a "distinct" and "unequivocal" declaration of an
6  intention not to perform. <u>Id</u>. Defendant denied coverage on July 26, 2010 in a letter stating
7  coverage was excluded under the prior knowledge warranty. (Dkt. 101 at 1.) Defendant did not
8  indicate it would refuse, should it be found liable, to provide payment once the underlying
9  insurance was exhausted. (<u>Id</u>.)
10  Plaintiff's breach of contract claim also fails because Defendant paid Plaintiff once
11  Hudson exhausted its underlying limits. A court interprets an insurance contract according to the
12  entirety of the policy's terms and conditions. RCW 48.18.520. The term "exhaustion" is not
13  defined in the policy. (Dkt. No. 108- 1 at 4-6.) "Exhaust" is commonly understood to mean "to
14  drain of resources or properties; deplete." <u>The American Heritage Dictionary of the English
15  Language</u>, 622 (Joseph P. Pickett et al. eds., 4th ed. 2000); <u>Lynott v. Nat'l Union Fire Ins. Co.</u>,
16  123 Wn.2d 678, 689-90 (1994) (a court interprets contracts with the understanding of an ordinary
17  purchaser of insurance and gives terms their plain, ordinary, and popular meaning). Under the
18  policy, "exhaustion" occurs "by reasons of losses paid." (Dkt. No. 108-1 at 4.) By the terms of
19  the policy, Plaintiff could substitute its own payments for those of Hudson in order to exhaust the
20  policy only in the event Hudson became insolvent, which, in this case, it was not. <u>Id.</u> Therefore,
21  the Court grants Defendant's motion for summary judgment on Plaintiff's breach of contract
22  claim because Defendant paid Plaintiff $5 million after Hudson exhausted the underlying policy
23  by making its final payment on April 27, 2011. (Dkt. No. 108-12 at 1; Dkt. Nos. 19, 20.)
24

ORDER ON PARTIAL SUMMARY JUDGMENT- 6

1   D. Bad Faith

2   The Court denies summary judgment on Plaintiff's bad faith claim because a genuine
3   issue of material fact exists regarding whether, at the time of applying for insurance, Fuhlendorf
4   had knowledge of acts, errors, or omissions that might give rise to a claim under the policy. In
5   Washington, an insurance company has a duty to act in good faith, which includes a broad
6   obligation of fair dealing and a responsibility to give equal consideration to the insured's
7   interests in all matters. Tank v. State Farm Fire & Cas. Co., 105 Wn.2d 381, 385-86 (1986).
8   Violation of that duty gives rise to a tort action for bad faith. Am. States Ins. Co. v. Symes of
9   Silverdale, Inc., 150 Wn.2d 462, 469 (2003). To prevail on a claim of bad faith denial of
10  coverage, an insured must prove a defendant's denial of benefits as frivolous, unreasonable or
11  unfounded. Rizzuti v. Basin Travel Service of Othello, Inc., 125 Wn. App. 602, 616 (2005). In
12  Washington, when an insurance company denies coverage based on a prior-knowledge warranty
13  or exclusion clause in a policy, a court must determine whether the insured subjectively knew at
14  the time the insurance was purchased of any facts that might give rise to a claim under the
15  policy. Pub. Util. Dist. No 1 of Klickitat County v. Int'l Ins. Co., 124 Wn.2d 789, 806-07 (1994).
16  Defendant fails to show that it acted in good faith when, on July 26, 2010, Defendant sent a letter
17  to Plaintiff in which it denied coverage to Fuhlendorf for violating the prior knowledge warranty.
18  (Dkt. No. 65 at 9; Dkt. No. 49 at 18-19.)

19  Defendant cited two emails it received from Isilon as part of Defendant's investigation
20  into Plaintiff's claim for coverage of the Underlying Action to support its coverage
21  determination. The first email is from Fuhlendorf to Dave Reid, the Vice President of Operations
22  at CDI Corporation, Isilon's customer, on June 29, 2006, discussing the handling of a shipment
23  of Isilon's product. (Dkt. No. 102 at 1.) Specifically, Fuhlendorf stated:

24

ORDER ON PARTIAL SUMMARY JUDGMENT-
7

> "Isilon will be shipping a maximum of 60 nodes to CDI to fulfill the P.O. received by CDI from Comcast for their VOD rollout. Any incidental charges associated with the storage of the units at a central location (i.e. repairs to facilities, extra insurance, extra shipping charges) will be covered by Isilon if needed."

(Dkt. No. 102 at 1.) Defendant argues Fuhlendorf's offer to pay "[a]ny incidental charges associated with the storage of the units at a central location" establishes that Isilon was "shipping more product that CDI could actually commit to reselling" and that Fuhlendorf's "primary motivation" was to allow Isilon to "recognize revenue on these sales prematurely in order to artificially inflate its financial statements." (Dkt. No. 101 at 10.) However, this email could also be interpreted to show that Fuhlendorf was engaging in an ordinary business practice of establishing the delivery schedule with CDI. The email clearly states that CDI had a buyer in Comcast and the specified amount of nodes was per Comcast's order with CDI. (Dkt. No. 102 at 1.) There is no indication that Isilon was shipping more product to CDI than CDI planned to resell, because the 60 nodes were being sent to CDI for Comcast's order. Additionally, the email does not establish how revenue was recognized for this sale and does not indicate that Fuhlendorf intended to improperly recognize revenue, or that such recognition actually occurred.

The second email Defendant cites is from Fuhlendorf to Steve Goldman, Isilon's former CEO, on March 27, 2006, discussing the timing of Isilon's product shipments. (Dkt. No. 104 at 1.) Specifically, Fuhlendorf stated:

> "I would recommend shipping low margin work this quarter and holding the "higher calorie" orders for Q2. The main reason is that we have the positive effect of betas and some 2250's this quarter among with some reserves. We are going to need higher margin work in Q2 because of the lack of a beta program and most of the 1440s and 2250s are gone."

(Dkt. No. 104 at 1.) Defendant argues that this email shows Fuhlendorf "endorsed manipulating the timing of product shipment (which directly affects when revenue is recognized)" to smooth

ORDER ON PARTIAL SUMMARY JUDGMENT-
8

1    Isilon's financial results. (Dkt. No. 101 at 10.) Defendant asks the Court to infer from

2    Fuhlendorf's email that he intended to manipulate revenue by moving around the timing of

3    product shipments. (Id.) However, there is nothing in the email to suggest that Fuhlendorf's

4    recommendation to ship "low margin work this quarter" and hold "the "higher calorie" orders for

5    Q2" was intended to change shipments solely to circumvent Isilon's revenue recognition policy.

6    There could have been legitimate reasons that may have motivated Fuhlendorf's decision to

7    change the timing of shipments such as convenience or a desire to ensure that all condition

8    precedents of Isilon's revenue recognition policy were met before shipping a product to a

9    customer.

10           Defendant fails to conclusively show that Fuhlendorf was aware of and did not disclose

11   his knowledge of acts, errors, or omissions that led to the SEC claim when Plaintiff signed the

12   insurance policy warranty on November 21, 2006. (Dkt. No. 48 at 17; Dkt. No. 137, Ex. 1 at 27.)

13   A court evaluates what the insured should have anticipated based on the information available to

14   him at the time. See Tewell, Thorpe & Findlay, Inc., P.S. v. Continental Cas. Co., 64 Wn. App.

15   571, 578-79 (1992) (finding insured law firm had knowledge possibly giving rise to a claim

16   where it received a letter threatening malpractice litigation before it applied for insurance). Had

17   Defendant provided emails authored by Fuhlendorf delineating his plan to violate Isilon's

18   revenue recognition policy, it would be obvious that Fuhlendorf had violated the warranty.

19   However, because Defendant cannot conclusively establish that Fuhlendorf anticipated the SEC

20   claim, a question of fact exists. Therefore, the Court denies Defendant's motion for summary

21   judgment on Plaintiff's bad faith claim.

22   E. Insurance Fair Conduct Act

23           A genuine issue of material fact exists regarding Plaintiff's IFCA claim because it is

24   unclear whether Defendant denied coverage in bad faith. Under IFCA, an insured may bring an

ORDER ON PARTIAL SUMMARY JUDGMENT-
9

action against an insurer who unreasonably denies coverage or payment of benefits. RCW 48.30.015(1). Here, Defendant has not conclusively shown that Fuhlendorf knew, prior to applying for insurance, that his actions might lead to a claim under the policy. Therefore, the Court denies Defendant's motion for summary judgment on Plaintiff's IFCA claim.

## Conclusion

The Court GRANTS Defendant's motion for summary judgment on Plaintiff's claims for breach of contract and violation of the CPA because Defendant paid Plaintiff $5 million under the contract and there are no damages. The Court DENIES Defendant's motion for summary judgment on Plaintiff's bad faith and IFCA claims because a genuine question of material fact exists regarding whether Defendant was reasonable in denying coverage.

The clerk is ordered to provide copies of this order to all counsel.

Dated this 9th day of April, 2012.

Marsha J. Pechman
United States District Judge